**Supreme Court**

No. 2015-40-Appeal.
(PM 14-882)

In re: The Janet S. Bagdis Living Trust    :
Agreement Dated September 23, 1996, as
amended on January 12, 2007 and July 26,
2008.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re: The Janet S. Bagdis Living Trust   :
Agreement Dated September 23, 1996, as
amended on January 12, 2007 and July 26,
2008.

Present: Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** Kimberly Bagdis, a self-represented appellant, seeks to vacate a Superior Court order that required the disposition of funds held in trust for her be used to pay attorneys' fees. Before this Court, she argues that the trial justice made several reversible errors. First, she argues that the trial justice erred when he approved the first and final accounting of the trustee and appellee, Lynne Wilson and when he approved the payment of the settlor's final debts and expenses, as well as administration costs, from the trust. Second, she argues that the trial justice erred when he discharged and released Wilson from her fiduciary duty because Wilson had breached that duty by administering the trust's assets in an imprudent manner. Third, she contends that her due process rights were violated by the Superior Court. In this regard, she maintains that the trial justice erred because Wilson was allowed to testify at "an unscheduled, impromptu hearing" when Kimberly was not present and that she did not have an

- 1 -

opportunity to cross-examine her. She also argues that the trial justice violated her right to due process when he limited her time for argument during a subsequent hearing.

This matter came before us on December 9, 2015, pursuant to an order directing the parties to appear and show cause why the issues raised by the appeal should not summarily be decided. After considering the parties' oral and written arguments and examining the record, we are of the opinion that cause has not been shown and that this case can be decided without further briefing or argument. For the reasons given below, we affirm the judgment of the Superior Court.

## Facts and Travel

### The Trust

Janet Bagdis died on January 17, 2010. Before her death, she established an inter vivos trust, the Janet S. Bagdis Living Trust. That trust, as amended, provided for three shares that were to be apportioned among her children and grandchildren. Specifically, her daughter and successor trustee, Lynne Wilson, was to receive 50 percent; her son, Neil, was to receive 30 percent; and the remaining 20 percent was to go to Wilson to hold in trust for the benefit of Janet's grandchildren, Kimberly and Jeffrey.[1] There was a provision that the 20 percent share was to be distributed at Wilson's discretion for the care of Jeffrey and Kimberly until March 13, 2014, when the younger of the two, Kimberly, reached the age of twenty-five. At that time, whatever remained of the 20 percent share was to be distributed to the two grandchildren in equal shares. Because neither of the grandchildren had attained the age of twenty-five at the time of the settlor's death, the trustee, Wilson, elected to establish a second trust to administer

---

[1] Because several individuals share the same last name, we will refer to them by their first names. No disrespect is intended. Kimberly and Jeffrey are the children of Janet's son, Jay. That son was not a beneficiary of the living trust.

the 20 percent share. This second trust was denominated the Janet S. Bagdis Continuing Trust (the Trust) and the corpus was held in a cash account at Fidelity Investments.

Under her discretionary powers, Wilson apparently intended to distribute all the remaining assets in equal shares to Jeffrey and Kimberly before the automatic termination date of March 13, 2014. Wilson asked both Jeffrey and Kimberly to sign a release discharging her of her duties and releasing her of any liability. As is common in trust administration, in return for a release, Wilson would then make the distribution of that beneficiary's share of the Trust. Kimberly did not sign the release in exchange for the distribution of her $37,565.75 share.[2]

**Epistolary Episodes**

The record indicates that between September 2010 and December 2012, Wilson attempted on numerous occasions to contact Kimberly to discuss the distribution of the Trust assets that were being held for her benefit. After she sent Kimberly four letters, via certified or priority mail, to her home in Pennsylvania, and after speaking with both Kimberly's brother and mother, Wilson finally heard from Kimberly in December 2011. Kimberly explained to her aunt that she had received both the letter informing her of her share and the accompanying release, but that she had not yet gone to the bank to set up the necessary account to deposit the funds and that she needed a new copy of the release. Wilson obliged, and followed up in January 2012 by sending Kimberly a text message to ensure that the release had arrived. Kimberly informed her aunt that the materials had arrived, but that she still had yet to go to the bank.

When, after the passage of ten more months, Wilson had no further response from Kimberly, she decided to make two last attempts at contacting her niece. First, Wilson sent Kimberly yet another letter, again asking that she sign the release and requesting that she call if

---

[2] Kimberly was the only beneficiary who did not sign a release. After Wilson received a release from her brother Neil and her nephew Jeffrey, she immediately distributed their shares.

- 3 -

she had any questions about the process.  Also, Wilson both telephoned Kimberly and sent her a text message to follow up on this latest correspondence.  Once again, Wilson did not receive a response.  Finally, by March 2013, it became apparent to Wilson that Kimberly would not be signing the release.   With Kimberly's twenty-fifth birthday—and, therefore, the Trust's termination—looming in the near future, Wilson retained the services of an attorney to advise her about the winding down of the Trust.

The attorney sent Kimberly a letter explaining that the distribution of $37,565.75 to her was one of the final tasks necessary to complete the administration of her grandmother's estate.  Wilson's attorney also informed Kimberly that her failure to return the executed release would result in a further delay in administering the estate and waste Kimberly's portion of the Trust proceeds.  Again, the letter asked Kimberly to call if she had any questions.   Kimberly did not respond to Wilson or her attorney for four months.

At long last, Kimberly responded in August 2013.  In her letter to Wilson, Kimberly acknowledged that she had received the letter from Wilson's attorney and she requested a full accounting of the Trust account.  Additionally, Kimberly instructed Wilson that in terminating the Trust, "no funds to which I am entitled should be spent to pay for an attorney for this purpose.  If you need to have an attorney guide you in how a trustee should conduct herself, then it is your responsibility to pay for that attorney personally."  Kimberly replied separately to Wilson's attorney, repeating her request for an accounting and informing him of her refusal to sign the release, in part based on her belief that Rhode Island law does not require that a beneficiary  sign a release before receiving her share of the Trust assets.

Wilson acquiesced to Kimberly's request two weeks later.  In her response, Wilson included a detailed explanation and accounting of the Janet S. Bagdis Living Trust and the Janet

S. Bagdis Continuing Trust. The explanatory letter included copies of all documents regarding expenses paid from the Trust, tax filings, as well as an accounting of the remaining available Trust assets, totaling $36,559. Wilson followed up with a phone call and text message to Kimberly several days later. She again received no reply. Wilson then reached out to Kimberly's brother, Jeffrey, in hopes of resolving the situation. When she spoke with Jeffrey in mid-September, she explained that she had been trying to close the estate for the previous three years but had been unable to do so because of Kimberly's reluctance.[3]

Several days later, Wilson received a letter from Kimberly, restating her refusal to sign the release because she believed it required a "fraudulent attestation," and that it was "illegal." Kimberly then requested that Wilson immediately disburse her share of the Trust to her, without a release. Wilson forwarded this letter to her attorney who, in turn, responded to Kimberly, informing her that although there was no law requiring her to sign the release, doing so is standard procedure in trust administration and that there was nothing fraudulent about asking her to sign it. Included in the letter was an updated release for the amount of $32,500, which sum reflected the legal fees that had been incurred by the Trust. The letter requested that Kimberly respond by October 25, 2013.

By January 2014, there was still no response from Kimberly. Wilson's attorney sent Kimberly yet another letter, by certified mail, informing her of Wilson's intention to file a miscellaneous petition in the Providence County Superior Court seeking permission to deposit Kimberly's funds in the court registry so Wilson could wind down the administration of the Trust, terminate it, and be released from her fiduciary duties. Wilson also requested that Kimberly respond by the end of January to claim the remaining $32,500 so as to avoid any

---

[3] She also forwarded Jeffrey the most recent correspondence between herself and Kimberly. Jeffrey reached out to his sister, who again stated that she would refuse to sign the release.

further expenses and delays associated with filing in the Superior Court. The certified letter's return receipt was returned during the first week of February, signed by "P. Bagdis."[4] Wilson again sought out Jeffrey in hopes of getting in touch with Kimberly. He reported back a week later, saying that he had spoken to Kimberly but that she still refused to execute the release.

Finally, on February 27, 2014, Wilson filed a miscellaneous petition in the Superior Court. Several days later, Wilson received a letter from Kimberly on March 1, 2014. In it, Kimberly accused Wilson of breaching her fiduciary duty by failing to prudently manage the Trust assets and by her "appalling" decision to hire an attorney and use Trust assets that had been "frittered away on unnecessary legal expenses." Kimberly again demanded that Wilson immediately distribute the remaining Trust assets without requiring that she sign the release. The Superior Court scheduled a hearing for March 19, 2014, to hear Wilson's petitions. According to Wilson, she received a call on March 9, 2014, from Kimberly's mother, Pamela, who discouraged her from going forward with the court proceedings.

However, an undaunted Wilson telephoned Kimberly to explain that she would be going forward with her petitions in Superior Court. When Kimberly did not return her call, Wilson sent Kimberly a text message informing her of the same. Kimberly responded to her aunt's text message with another letter, dated March 11, 2014, reiterating her refusal to sign the release and challenging the accuracy of the accounting that Wilson had provided to her.

### The Hearings

Kimberly did not appear at the scheduled hearing on March 19, 2014. Nonetheless, the trial justice ordered that the remaining Trust assets be deposited into the court registry. Wilson filed several other miscellaneous petitions including petitions for (1) approval of the first and

---

[4] Kimberly's mother is Pamela Bagdis. Apparently, she is a graduate of Drexel University's School of Law.

final accountings; (2) termination of the Trust; and (3) approval of attorneys' fees. Those matters were scheduled for a hearing on July 16, 2014.

The acrimonious correspondence finally ended when Kimberly attended the July hearing. The trial justice expressed concern about the payment of legal fees from Kimberly's share of the trust. Specifically, the trial justice asked what, if any, case law Wilson had to support the payment of attorneys' fees from a beneficiary's share of the Trust, in light of the fact that the release benefited only the fiduciary, Wilson, and not the beneficiary, Kimberly. After asking Kimberly what concerns she had about her aunt's administration and accounting of the Trust assets, the trial justice continued the matter until August 21, 2014. In the meantime, Wilson was instructed to provide the court with a memorandum outlining Wilson's ability to charge reasonable and necessary attorneys' fees against Kimberly's share of the Trust and to provide Kimberly with more information regarding certain expenses that had been incurred during the administration of the Trust.

Just before the new hearing date, Wilson's attorney received a call from Pamela, Kimberly's mother, advising him that Kimberly would be unable to attend the hearing and requesting that the matter be rescheduled to September 17, 2014. Wilson's attorney complied with that request. That day, Wilson's attorney received an email from Kimberly at 12:45 a.m., confirming that the hearing would take place at 2 p.m.[5] When Kimberly failed to appear, the trial justice heard argument from Wilson's attorney and granted her motion to approve the accounting and the motion for attorneys' fees. He also ordered that Wilson be released from her duties as trustee.

---

[5] When Wilson's attorney appeared for the hearing he was informed that, because the trial justice was presiding over a trial, the matter would be heard before a different justice of the Superior Court.

Around 10:30 p.m. that evening, Wilson's attorney received an email from Kimberly stating that the matter was going to be heard the next day, September 18, 2014, at 9:30 a.m. The following morning, citing a scheduling error in the clerk's communication with Kimberly, the Superior Court vacated its prior rulings and allowed Kimberly to be heard on the record. After hearing Kimberly's concerns about the $3,663.89 in reimbursements to Wilson and the attorneys' fees, the trial justice granted both motions. The trial justice found that the claimed attorneys' fees of $5,777.44 were fair and reasonable and ordered that they be paid from Kimberly's share of the Trust. Kimberly timely appealed those decisions.

**Analysis**

**1**

**Did the Superior Court Err In
Approving The First and Final Accounting?**

Before this Court, Kimberly argues that the Superior Court erred when it approved the first and final accounting and when it approved the payment of the final debts and expenses, as well as administration costs, from the corpus of the Trust. She maintains that Wilson breached her fiduciary duty by not using funds she alleges were available outside the Trust to pay those costs.[6] However, it is apparent to us that Kimberly overlooks the language set forth in paragraph second of the Trust that says that "the Trustee shall pay from the Trust as a whole or any part of the Settlor's debts, the expenses of the Settlor's funeral and of settling the Settlor's estate, legacies provided in the Settlor's will, and estate, inheritance and other death taxes * * *." (Emphasis added.) It is clear to this Court that the Trust not only authorized Wilson to pay all or

---

[6] Kimberly cites to a homeowner's policy in Janet's name. However, that policy related to Wilson's home, where Janet was the sole occupant. Kimberly also points to miscellaneous furniture and a vehicle that Janet owned. The record reveals that Wilson disposed of the furniture and vehicle and the $500 in proceeds were deposited into the Trust account.

part of these expenses from the Trust, but indeed, it mandated that she do so.  We have held that when "the language of a trust or a will 'expressly states the [settlor or] testator's intention, resort to the rules of  * * * construction is without warrant * * *.'"  Steinhof v. Murphy, 991 A.2d 1028, 1033 (R.I. 2010) (quoting In re DiBiasio, 705 A.2d 972, 973–74 (R.I. 1998)).  Because the Trust expressly authorized Wilson to use the Trust assets to pay these costs, the trial justice committed no error when he approved the first and final accounting.

**2**

**Did the Superior Court Err In
Discharging Wilson From Her Fiduciary Duties?**

Kimberly further argues that the Superior Court erred when it discharged and released Wilson from her fiduciary duty because, she contends, Wilson breached that duty by acting in an imprudent manner because she placed Kimberly's share of the Trust in a cash account after Janet's death.  Moreover, Kimberly argues that Wilson's actions violated G. L. 1956 § 18-15-1, which holds trustees to a standard of care under the "Prudent [I]nvestor [R]ule."  Section 18-15-2(b) requires a review of "[a] trustee's investment and management decisions respecting individual assets * * * not in isolation but in the context of the trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the trust."  In devising an overall investment strategy, § 18-15- 2(c) requires that a trustee consider, among other things, "(1) [g]eneral economic conditions; (2) [t]he possible effect of inflation or deflation; * * * (5) [t]he expected total return from income and the appreciation of capital; [and] * * * (7) [n]eeds for liquidity, regularity of income, and preservation or appreciation of capital[.]"  Importantly, under the Prudent Investor Rule, "the prudence of a trustee's conduct is to be judged on the basis of circumstances at the time of that conduct, not with the benefit of

hindsight or by taking account of developments that occur after the time of the action or decision." Restatement (Third) Trusts § 77 cmt. a at 82 (2007).

Kimberly argues that placing the Trust assets in a cash account was imprudent because the funds earned "a meager $59.66" in interest over four years. However, even hindsight is of no help to Kimberly. First, the record is clear that Wilson did not intend to hold the assets for Kimberly's benefit until the Trust terminated by court order on October 1, 2014. Rather, she intended to distribute Kimberly's share almost immediately after Janet's death in 2010. It was because of Kimberly's delay and obstruction that Wilson was forced to defer the distribution of the Trust assets. Even with that consideration, given the relatively short and finite period between Janet's death and the termination of the Trust, we cannot say that Wilson breached her fiduciary duty. We agree with Wilson that she did not breach her fiduciary duty by placing the entirety of the funds into a cash account to insulate the assets from the risk of market volatility and preserve the assets over a relatively short time horizon.

**3**

### Did the Superior Court Err In Ordering That Attorneys' Fees Be Paid Out Of Kimberly's Share?

Kimberly argues that the Superior Court erred when it ordered that the fiduciary's attorneys' fees be paid from her share of the Trust assets. We disagree. Kimberly is correct in pointing out that there is no statutory requirement that she sign a release before funds from the estate are disbursed to her. However, it is significant that, until the Trust's original termination date of March 13, 2014, Wilson was under no obligation to disburse anything to her because Wilson was vested with complete discretion about when and in what amount to disburse them. With respect to the attorneys' fees, we have recently affirmed the proposition that "we typically adhere steadfastly to the American Rule that, in the absence of a statute providing otherwise,

each litigant is responsible for the litigant's own legal expenses." Shine v. Moreau, 119 A.3d 1, 9 (R.I. 2015). However, exceptions exist to that rule; specifically, a judge may appropriately award attorneys' fees to the prevailing party where contractual or statutory authorization exists. See Insurance Company of North America v. Kayser-Roth Corp., 770 A.2d 403, 419 (R.I. 2001). For a statutory basis to exist, "our precedent indicates that a statute must explicitly include attorneys' fees in order for a court to award attorneys' fees pursuant to that statute." Shine, 119 A.3d at 10 (citing Eleazer v. Ted Reed Thermal Inc., 576 A.2d 1217, 1221 (R.I. 1990)). But once it has been established that "there is such a basis, then this Court will review a motion justice's actual award of attorneys' fees for an abuse of discretion." Blue Cross & Blue Shield of Rhode Island v. Najarian, 911 A.2d 706, 709 (R.I. 2006). Here, it is our opinion that there is such statutory authorization. General Laws 1956 § 18-6-2 says in relevant part:

> "(a) Whenever a trustee holds any sum of money * * * payable or deliverable to, or the property of, another, and the person entitled to it cannot, for any reason, give proper receipt or discharge for it, and the trustee holding the money or property desires to free himself or herself from further liability for it, the trustee may pay or deliver the money or property into the registry of the [S]uperior [C]ourt, presenting with it his or her petition praying to be discharged, and setting out, under oath, to the best of the knowledge, information, and belief of the affiant, the circumstances under which the trustee holds the money or property, and how the other person or persons is or are entitled to it, and why the trustee or they cannot give proper receipt or discharge for the money or property; and upon the filing of the petition, notice of it shall be given in the manner that the court shall direct.
>
> "* * *
>
> "(c) The costs and expenses, including expenses and counsel fees of the trustee, as between solicitor and client, as allowed by the court or by one of the justices of the court, shall be paid or retained accordingly out of the money or property." (Emphases added.)

- 11 -

In interpreting the language of § 18-6-2, we are very much aware of the fundamental principle that "when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." State v. Diamante, 83 A.3d 546, 548 (R.I. 2014) (quoting Accent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996)). However, "[w]ith respect to statutes providing for an award of attorneys' fees, we have stated that such statutes 'are in derogation of the common law' and, consequently, must be strictly construed." Shine, 119 A.3d at 10 (quoting Moore v. Ballard, 914 A.2d 487, 489 n.3 (R.I. 2007)).

Although we have not yet construed § 18-6-2 in this context, it is clear that the statute expressly provides that when a beneficiary for any reason cannot discharge a trustee of his or her fiduciary duty, the trustee may deposit the funds into the court's registry. We are of the considered opinion that, despite the necessity for strict construction, the phrase "for any reason" creates a broad standard that includes a beneficiary's outright refusal to release a fiduciary of personal liability in exchange for receiving her share of the trust assets. By allowing a trustee to deposit the trust's remaining assets into the court's registry when such an occasion arises, § 18-6-2 strikes an appropriate balance between incentivizing an individual to serve as trustee, by ensuring that that individual does not face the specter of future personal liability, while also providing the beneficiary with the opportunity to demonstrate the trustee's liability for any potential breach that may have occurred before the assets were deposited in the court's registry.

Moreover, the language in § 18-6-2(c) providing that attorneys' fees be paid out of trust assets "as allowed by the court or by one of the justices of the court" also strikes a balance between the American Rule and our courts' equitable authority to award attorneys' fees. See Najarian, 911 A.2d at 711 n.5 (acknowledging this Court's ability to award attorneys' fees "as an

exercise of its inherent power to fashion an appropriate remedy that would serve the ends of justice") (quoting Vincent v. Musone, 574 A.2d 1234, 1235 (R.I. 1990)).  This, of course, is not to say that simply because § 18-6-2 provides for an exception to the American Rule, it opens the door for attorneys' fees in every case that falls within its ambit.  Rather, when awarding attorneys' fees, the discretion exercised by a trial justice should be "in the light of reason as applied to all the facts and with a view to the rights of all the parties to the action while having regard for what is right and equitable under the circumstances and the law."  Dauray v. Mee, 109 A.3d 832, 846 (R.I. 2015) (quoting Hartman v. Carter, 121 R.I. 1, 4-5, 393 A.2d 1102, 1105 (1978)).  It is to the application of that discretion that we now turn.

After a review of the record, we cannot say that the trial justice abused his discretion when he ordered that attorneys' fees be paid from Kimberly's share of the Trust assets.  The record is clear that any delay in the distribution of Kimberly's share was the result of her own recalcitrance, her refusal to respond to notices, her requests for continuances, and her refusal to sign the release after Wilson's continued efforts to make contact with her in attempt to distribute the funds to Kimberly.  In short, Kimberly led the trustee on a wild goose chase while the trustee made every reasonable effort to conclude the matter.  It is also clear from the record that Kimberly's stubborn lack of cooperation made it necessary for Wilson to petition the court to accept the deposit of the remaining Trust assets into the court registry.  Importantly, Kimberly argued before the trial justice that she refused to sign the release because it would have discharged Wilson in her individual capacity.  However, when asked by the trial justice if she had any claims against Wilson personally, Kimberly conceded that she had none.  Absent any legitimate reason why Kimberly would refuse to sign the release, which would have rendered

this litigation unnecessary, it is our opinion that the trial justice did not abuse his discretion when he concluded that the attorneys' fees should be satisfied from Kimberly's share of the Trust.

**4**

**The Due Process Issues**

Kimberly argues that she did not receive proper notice of the September 17, 2014 hearing and that her due process rights were violated because she was unable to cross-examine Wilson while she was under oath.[7] These arguments are without merit because Kimberly has failed to demonstrate that any specific due process right was violated in the proceedings below. First, it is clear from the record that Kimberly did in fact receive notice of the September 17, 2014, hearing date. The record reveals that the hearing was originally scheduled for August 21, 2014, and that it was Kimberly, through her mother, who requested that the hearing be rescheduled to September 17, 2014. The record further demonstrates that Kimberly sent an email to Wilson's counsel at 12:54 a.m., the morning of the September 17, 2014, hearing to confirm that the hearing was scheduled for later that day. Second, the scheduling confusion aside, the record further reveals that the very next day the trial justice vacated the ruling that he had made the previous day and that Kimberly was fully heard on her objections to the accounting and payment of legal fees. Importantly, Kimberly did not raise the issue of her inability to question Wilson at the September 18, 2014, hearing and, therefore, she waived the issue and may not now raise it on appeal. See Heritage Healthcare Services, Inc. v. Beacon Mutual Insurance Co., 109 A.3d 373, 377 n.9 (R.I. 2015) ("[I]ssues not properly presented before the trial court may not be raised for

---

[7] Kimberly also argues that Wilson violated her brother Jeffrey's due process rights by failing to give proper notice. However, Jeffrey is not before this Court challenging the notice and Kimberly does not have standing to assert her brother's right to notice. See Cruz v. Mortgage Electronic Registration Systems, Inc., 108 A.3d 992, 996 (R.I. 2015) (noting "standing is generally limited to those plaintiffs asserting their own rights, not the rights of others") (quoting Mruk v. Mortgage Electronic Registration Systems, Inc., 82 A.3d 527, 535 (R.I. 2013)).

the first time on appeal."). Therefore, this Court can discern no violations of Kimberly's due process rights.

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment. This case is remanded to that tribunal for it to determine the amount of reasonable attorneys' fees Wilson's attorneys may be entitled to receive in connection with this appeal.

Justice Robinson did not participate.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      In re: The Janet S. Bagdis Living Trust Agreement Dated September 23, 1966, as amended on January 12, 2007 and July 26, 2008.

**CASE NO:**      No. 2015-40-Appeal.
(PM 14-882)

**COURT:**      Supreme Court

**DATE OPINION FILED:**      March 24, 2016

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**      Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Brian Van Couyghen

**ATTORNEYS ON APPEAL:**

For Appellant:   Kimberly A. Bagdis, Pro Se

For Appellee:  Nicole J. Benjamin, Esq.
                Joseph R. Marion III, Esq.